## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN FLYNN, et al., | |
| **Plaintiffs,** | |
| v. | **Civil Action 04-00590 (HHK)** |
| INTERIOR FINISHES, INC., et al., | |
| **Defendants.** | |

### MEMORANDUM OPINION AND ORDER

In this action, the trustees of the Bricklayers and Trowel Trades International Pension Fund ("Trustees" or "Fund"), a multiemployer employee benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, allege that defendants, Interior Finishes, Inc. ("Interior Finishes") and R.H.I., Inc. ("RHI"), failed to make required contributions to the Fund in violation of ERISA. Before the court are the parties' cross motions for summary judgment [#22 and #23]. Upon consideration of the motions, the oppositions thereto, and the record of this case, the court concludes that the Trustees' motion for summary judgment must be denied, and defendants' motion for summary judgment must be granted in part and denied in part.

### I.  BACKGROUND INFORMATION

The Fund provides pension and other benefits to employees working in the construction industry under collective bargaining agreements negotiated between local unions and employers.

Pursuant to these agreements, employers are obligated to make contributions to the Fund in order to pay for the benefits provided to the Fund's beneficiaries. The Fund is authorized to effect collections on behalf of itself, the International Union of Bricklayers and Allied Craftworkers ("BAC"), the Bricklayers and Trowel Trades International Health Fund ("IHF"), and the International Masonry Institute, and other local funds. The Trustees have a fiduciary duty under ERISA to collect delinquent employer contributions and can be held personally liable for their failure to do so.

Dale R. Stevens established RHI in 1989 as a general contracting business to work on residential and commercial construction projects. In 1993, RHI was incorporated in Maryland. From its formation until today, Stevens has been RHI's sole owner, officer, and director. As a general contractor, RHI would typically subcontract out the work on its construction projects to various subcontractors. As a result, most of RHI's work force was limited to office employees, with few, if any, field employees at any given time. Throughout most of its history, RHI operated almost exclusively as a general contractor on non-union projects. RHI has never entered into any collective bargaining agreements with BAC or any of its local affiliates.[1]

During the late 1990s, RHI's work began to focus primarily on the sale and installation of flooring. In 1999, in response to demand among customers who needed a flooring installation

---

[1] On one occasion, a two-page wage rate agreement with a BAC local union was signed by Stevens, on behalf of Interior Finishes. Stevens later learned that, following his execution of the signature page, his secretary inadvertently inserted RHI rather than Interior Finishes as the applicable corporate entity on that signature page. The Trustees do not dispute that this wage rate agreement was actually entered into on behalf of Interior Finishes and not RHI.

project performed with union labor, Stevens formed a separate corporation in Maryland—Interior Finishes—to install and supply floor coverings using an all-union work force.  Stevens also served as the sole owner, officer, and director of Interior Finishes.

Before incorporating Interior Finishes, Stevens met with local representatives of both BAC and the United Brotherhood of Carpenters and Joiners of America, AFL-CIO, ("Carpenters Union") in Maryland.  In 2000, Interior Finishes entered into a collective bargaining agreement with the Carpenters Union and began to perform flooring installation projects as a subcontractor for RHI using members of the Carpenters Union.[2]  The Carpenters Union was aware of the double-breasted nature of this operation and understood that RHI was a non-union entity that was engaged in the same flooring installation work as Interior Finishes.  The Carpenters Union agreed that RHI would obtain the contracts for work projects and subcontract to Interior Finishes when union labor was required on a particular job.  During 2000 and 2001, Interior Finishes used labor exclusively from the Carpenters Union.

In 2002, a representative from the May Company, a customer for whom RHI had been performing flooring work, informed Stevens that the May Company needed a flooring company that used union labor.  Consequently,  Interior Finishes was engaged to perform the work.  When Interior Finishes began performing work for the May Company in the Philadelphia area, local BAC representatives told Stevens that, in that geographic jurisdiction, tile installation could not

---

[2]  Stevens indicates that he did not initially enter into a collective bargaining agreement with BAC because the Carpenters Union, unlike BAC, was able to provide labor that could perform various types of floor installation work, including carpet, tile, and wood flooring installation.

be performed by the Carpenters Union but instead could only be performed by BAC union members.  As a result, Stevens met with BAC representatives in February 2002 to discuss the use of BAC union members for those flooring projects.  During this meeting, Stevens claims that he made clear to the BAC representatives that he ran a double-breasted operation wherein RHI performed work on a non-union basis and subcontracted union work to Interior Finishes.  Stevens also insists that he made clear that he owned both companies, that both companies operated out of the same facility, and that both companies performed floor installation work.  According to Stevens, the representatives from BAC acknowledged that RHI and Interior Finishes were separate corporations and agreed that only Interior Finishes would be subject to any agreement with BAC or its local affiliates.  The Trustees dispute these assertions and claim that Stevens was never assured that RHI would not be bound by the collective bargaining agreement between BAC and Interior Finishes.  The Trustees, however, never allege that they were ignorant of the relationship between RHI and Interior Finishes.  Moreover, at least one of the BAC representatives at the February 2002 meeting conceded that Stevens informed them that he owned and operated both Interior Finishes and RHI and that RHI typically operated as a general contractor while Interior Finishes directly performed flooring work.  Pl.'s Mot., Ex. F, ¶ 8.[3]

Thereafter, on behalf of Interior Finishes, Stevens allegedly signed a number of collective bargaining agreements with various BAC affiliates, including:  (1) a collective bargaining agreement with the Bricklayers and Allied Craftworkers Local Union No. 1, Maryland, Virginia

---

[3]  The declaration submitted by another attendee states that, "[a]t no point during the February 2002 meeting did Mr. Stevens raise any issues regarding his two different companies." Pl.'s Mot., Ex. G, ¶ 5.  That attendee, however, never claims that he was unaware of either the existence of or relationship between RHI and Interior Finishes.

and the District of Columbia ("the Maryland Agreement") in 2001;[4] (2) a Special International

Masonry Industry Agreement with the International Council of Employers of Bricklayers and

Allied Craft Workers ("the International Agreement") in 2002; and (3) an Independent

Agreement with Bricklayers and Allied Craftworkers Local 1 Massachusetts ("the Massachusetts

Agreement") in 2003.  Each of these agreements obligated Interior Finishes to file monthly

reports and to make contributions to the Fund and related BAC entities for covered work that it

performed under the agreements.  In addition, all of these agreements obligated Interior Finishes

to make dues checkoff payments to BAC.

Stevens contends that the version of the International Agreement he signed was different

in one key aspect from the standard collective bargaining agreements entered into by the

BAC—it did not include Article XIV.  The language of Article XIV, if applicable, would

obligate RHI to make contributions to the Fund for all covered work, regardless of whether RHI

and Interior Finishes are alter egos.[5]  Stevens claims that Ira Mitzner, counsel for the Fund,

authorized him to excise this provision from the agreement before signing it.  The Fund disputes

that Mitzner gave any authorization to Stevens to strike Article XIV.

---

[4]  As discussed in more detail below, Stevens claims that Interior Finishes is not bound by the version of the Maryland Agreement attached to the Trustees' Amended Complaint.

[5]  Article XIV, in relevant part, states:
> If and when the Employer shall perform any work of the type covered by this Agreement at any Construction site (i) under its own name, or (ii) under the name of another entity (whether a corporation, company, partnership, or any other business entity including a joint venture wherein the Employer, including its officers, or partners exercises [sic] either directly or indirectly (such as through family members) any significant degree of ownership, management or control, the terms and conditions of this Agreement shall be applicable to all such work.

Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), Ex. H, at 14.

In July 2003, the Trustees arranged for an audit of Interior Finishes' contributions to the Fund during the time period between March 2002 and April 2003. For that period, the auditor concluded that Interior Finishes failed to report almost 6,500 hours of covered work.[6] The auditor also determined that Interior Finishes owed over $50,000 in delinquent contributions, union dues checkoff payments, and interest. The amount determined by the auditor did not include the monies allegedly owed by Interior Finishes for the period after April 2003 nor did it include amounts allegedly owed by RHI.

The Fund's amended complaint seeks recovery of unpaid contributions from Interior Finishes and, claiming that RHI and Interior Finishes are alter egos, from RHI as well. The Trustees also seek an order compelling defendants to provide access to their records as well as other related relief.

## II. ANALYSIS

The Trustees move for summary judgment in their favor, arguing that the undisputed material facts demonstrate that Interior Finishes failed to make required contributions to the Fund. The Trustees also argue that Interior Finishes and RHI are alter egos of each other, and therefore, that RHI is also obligated to contribute to the Fund pursuant to the BAC collective bargaining agreements. Defendants likewise move for summary judgment, contending that the Trustees' claims for delinquent contributions against Interior Finishes are barred by the doctrine of equitable estoppel, are barred for failure to exhaust administrative remedies, and are preempted by the National Labor Relations Act. Defendants also argue that RHI should not be

---

[6] Defendants dispute this calculation, asserting that the auditor double-counted certain hours and incorrectly estimated other hours.

held liable as Interior Finishes' alter ego because application of this doctrine in this case would be inequitable.  Finally, defendants assert that, assuming *arguendo* that the Trustees' alter ego theory does apply in this case, the Trustees' claims nonetheless fail because:  (1) RHI's employees were independent contractors and ERISA imposes no obligation to make contributions on behalf of independent contractors; and (2) the Trustees failed to exhaust their administrative remedies.

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  Material facts are those "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970).  In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  The non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  FED. R. CIV. P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24 (1986).  The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor.  *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted.  *Anderson*, 477 U.S. at 249–50 (citations omitted).

**A.  Claims against Interior Finishes**

Section 515 of the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §
1145, obligates employers to make contributions to a multiemployer pension fund "in accordance
with the term and conditions" of any multiemployer plan or collective bargaining agreement.
Congress intended for Section 515 to "evince[] a strong congressional desire to minimize
contribution losses and the resulting burden such losses impose upon other plan participants."
*Flynn v. R.C. Tile*, 353 F.3d 953, 958 (D.C. Cir. 2004) (quoting *Upholsterers' Int'l Union
Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1328 (7th Cir. 1990)).

Section 502(g)(2) of ERISA makes this obligation enforceable by mandating that, if a
plan is successful in proving that an employer failed to make required contributions in violation
of Section 515, a pension plan "shall" receive an award that includes the unpaid contributions,
interest on those contributions, an additional computation of interest, and "reasonable attorney's
fees and costs."  29 U.S.C. § 1132(g)(2); *see also Bd. of Trs. of the Hotel & Rest. Employees
Local 25 v. JPR, Inc.*, 136 F.3d 794 (D.C. Cir. 1998).

*1.  Trustees' Claims*

The Trustees argue that they are entitled to summary judgment because there is no dispute
that Interior Finishes failed to comply with its obligation, imposed by the BAC collective
bargaining agreements, to contribute to the Fund and pay union dues.  Pl.'s Mot. for Summ. J.
("Pl.'s Mot.") at 11–14.  Defendants rejoin that summary judgment is not appropriate because the
Trustees have failed to show that the collective bargaining agreements at issue "create[] an
unambiguous contractual obligation on [Interior Finishes] to make contributions pursuant to the
contended provisions."  Def.'s Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Opp'n") at 31 (quoting

*Trs. of Bricklayers & Allied Craftworkers, Local 5 v. Charles T. Driscoll Masonry Restoration Co.*, 165 F. Supp. 2d 502, 510 (S.D.N.Y. 2001)).  Specifically, defendants argue that genuine disputes persist as to whether Interior Finishes was bound by any of the three collective bargaining agreements at issue in this case.  *Carpenters Fringe Benefit Funds v. McKenzie Eng'g*, 217 F.3d 578, 582 (8th Cir. 2000) ("Under ERISA § 515, the Funds may collect only those contributions that [the employer] is contractually obligated to pay."); *DeVito v. Hempstead China Shop, Inc.*, 38 F.3d 651, 653–54 (2d Cir. 1994).

The court will address the applicability of the three agreements in turn.

*a. Maryland Agreement*

The first collective bargaining agreement at issue in this case is the Maryland Agreement, allegedly entered into on May 1, 2001, between BAC and Local Union No. 1, Maryland, Virginia, and the District of Columbia.  Notably, Stevens admitted in his deposition that he signed a collective bargaining agreement with  Local Union No. 1 of Maryland, Virginia, and DC on behalf of Interior Finishes.  When asked whether Interior Finishes was party to a collective bargaining agreement with Local 1, Stevens responded, "I think that's correct."  Pl.'s Mot., Ex. C, at 124:10–18.  He explained that Interior Finishes entered into the Maryland Agreement in order to be able to use tile setters in Philadelphia, *id.* at 135:18–138:18 ("I needed to be able to use tile setters up there, and in order to do that apparently I had to sign with them."), and that he did so by fax.  *Id.* at 138:19–140:8.  There is no dispute that Interior Finishes made at least some contributions required under the agreement and submitted at least some of the required monthly reports.  *Id.* at 124:19–125:17.

Yet, despite conceding that Stevens entered in a collective bargaining agreement with Local Union No. 1, Maryland, Virginia, and the District of Columbia on behalf of Interior Finishes, defendants argue that Interior Finishes is not bound to make payments under that agreement because the *version* of the agreement attached to the Trustees' Amended Complaint, Am. Compl., Ex. A, and identified by Steven during his deposition was not the same version of the agreement that he signed.  Specifically, defendants note that the pagination of the version attached to the Amended Complaint does not match up with the signature page of that agreement.[7]  Defendants use this incongruity to accuse the Trustees of appending the signature page that Stevens admits signing to some other agreement.

In their reply brief, the Trustees note that there are two different versions of the Maryland Agreement and suggest that they may have attached the incorrect version of the agreement to the Amended Complaint.   Nonetheless, the two versions of the Maryland Agreement are identical in every respect, except for a change in font that affected the pagination of the agreement.  *Compare* Pl.'s Reply in Support of Summ. J. ("Pl.'s Reply"), Ex. C, *with* Pl.'s Reply, Ex. D.  Both versions include identical language and identical contribution obligations.

Defendants never dispute that Stevens signed the latter version of the Maryland Agreement on behalf of Interior Finishes.  Nor do they suggest that the two versions of that agreement differed in any substantive way.  Therefore, the Trustees' inadvertent failure to attach

---

[7]  The signature page is labeled page 25, but the version of the Maryland Agreement attached to the Trustees' Amended Complaint is only 22 pages long.

the correct version of the Maryland Agreement to their Amended Complaint does not create a

genuine dispute as to whether Interior Finishes agreed to, and was bound by, the substantive

provisions contained therein.

b. *Massachusetts Agreement*

Defendants similarly argue that the Trustees' reliance on the Massachusetts Agreement,

entered into on February 21, 2003, is "misplaced." Def.'s Opp'n at 33.  That agreement is only

three pages long and, rather than spelling out its own terms, expressly incorporates all terms of a

previous collective bargaining agreement, dated September 1, 1998, between the Building Trade

Employers Association of Boston and Eastern Massachusetts, Inc. and a local BAC union in

eastern Massachusetts.  One of the terms of the September 1, 1998 agreement suggests that it

expired on August 31, 2002, months before Stevens signed the Massachusetts Agreement.  Based

on this, defendants argue that "there remains a genuine dispute as to whether [the Massachusetts

Agreement] contractually obligated [Interior Finishes] to make contributions since [the

underlying agreement] had already expired." Def.'s Opp'n at 33–34.  This argument is without

merit and results from a misreading of the Massachusetts Agreement.

The Massachusetts Agreement specifically states that its duration is "coexistent with the

terms and conditions set forth" in the September 1, 1998, agreement, including "any extensions,

modifications, or renewals" of that agreement.  Pl.'s Mot., Ex. E, ¶ 2.  Although the initial term

of the September 1998 agreement expired on August 31, 2002, it included an "Evergreen Clause"

under which the agreement was annually extended for an additional year's term absent timely

notification of termination by one of the parties.  Pl.'s Reply, Ex. F, at 47.  As neither party

11

suggests that the September 1998 agreement was ever terminated pursuant to this clause, Interior

Finishes continued to be obligated to make contributions to the Fund during the time period

relevant to the Trustees' claims.

c. *International Agreement*

Finally, defendants admit that Stevens signed the International Agreement on behalf of

Interior Finishes but contend that the temporal scope of the agreement is more narrow than that

suggested by the Trustees.  First, defendants assert that, despite the fact that it is dated August 22,

2002, Stevens did not actually sign the International Agreement until late September or early

October 2002.  Def.'s Opp'n at 33.  This assertion is of no moment.

It is a basic principle of contract law that parties are free to contract as they see fit, within

certain limits.  *See, e.g.*, *Scrivner v. Sonat Exploration Co.*, 242 F.3d 1288, 1292 (10th Cir.

2002); *Seaway Port Auth. v. Duluth-Superior ILA Marine*, 920 F.2d 503, 510 (8th Cir. 1990);

*Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1009 (3d Cir. 1980).  This

includes the freedom to agree on the date when the parties would become contractually bound,

whether that date was before (or after) the date on which they actually signed the agreement.  17

C.J.S. *Contracts* § 74 (2005); *see also Brewer v. Nat'l Surety Corp.*, 169 F.2d 926, 928 (10th Cir.

1948) ("It is competent for the parties to agree that a written contract shall take effect as of a date

earlier than that on which it was executed, and when this is done, the parties will be bound by

such agreement.").  Because Stevens does not dispute that he intended the benefits and

obligations of the International Agreement to pre-date the signing of the contract, using August

22, 2002, as the effective date of the agreement most furthers the intentions of the parties.

12

Second, defendants allege that in January 2003 a BAC representative, Josh Marks, told

RHI's Controller, James Chaney, that Interior Finishes could "completely disregard" the

International Agreement.  Def.'s Opp'n at 33.  This comment, according to defendants, was an

express repudiation of the International Agreement and constituted a waiver of any rights to

collect contributions thereafter.  Defendants contend, therefore, that they were not bound by the

International Agreement after January 2003.

Whether Marks repudiated the International Agreement is ultimately irrelevant, for it is

clear that Interior Finishes continued to be obligated to make contributions to the Fund regardless

of whether Marks' conversation with Chaney effected a repudiation.  That is, even if the

International Agreement were repudiated, the Maryland Agreement and the Massachusetts

Agreement remained in effect.  Ultimately, because the contributions required by the local and

international agreements are identical, the court need not determine whether the International

Agreement was repudiated in January 2003.

### 2. Interior Finishes' Defenses

Having determined that Interior Finishes was bound to make contributions to the Fund

during the relevant time period—March 1, 2002 to July 15, 2003—the court will now address

defendants' arguments that: (1) the Trustees' claims are barred by the doctrine of equitable

estoppel; (2) the Trustees failed to exhaust their claims for unpaid union dues under the

grievance-arbitration provisions of the collective bargaining agreements; and (3) the Trustees'

claims for union dues are preempted under the National Labor Relations Act.

### a. Equitable Estoppel

Defendants first argue that the Trustees' claims for any delinquent contributions are equitably estopped because the Trustees' failure to demand such delinquent contributions prior to the initiation of these legal proceedings prejudiced defendants. To succeed on this defense, assuming that the doctrine is applicable in this context,[8] defendants are required to show that: (1) there was a "definite" representation to the party claiming estoppel; (2) the party relied upon its adversary's conduct to its detriment; and (3) reliance on the representation was "reasonable." *Graham v. SEC*, 222 F.3d 994, 1007 (D.C. Cir. 2000) (citing *Heckler v. Community Health Servs.*, 467 U.S. 51, 59 (1984)). Because the undisputed evidence demonstrates that the Fund made no "definite" representation that it would disclose the results of the audit prior to initiating this action, the Interior Finishes' equitable estoppel arguments must be rejected. *See Grumman Ohio Corp. v. Dole*, 776 F.2d 338, 347–48 (D.C. Cir. 1985) (equitable estoppel against government agency rejected where "there appears to have been no actual misrepresentation or concealment" and "no definitive statement was made"); *Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 83 (D.D.C. 2003) (doctrine of estoppel requires showing that "there was a 'definite' representation to the party claiming estoppel").

Defendants rely on two sources—the General Collection Procedures of the Central Collection Unit of BAC ("Collection Procedures") and the IHF Declaration of Trust—to support

---

[8] Defendants fail to cite a single case where the doctrine of equitable estoppel is applied to bar an ERISA fund from collecting contributions due to a failure to provide the employer with audit results prior to instituting litigation. Instead, defendants cite a Seventh Circuit case wherein the court used the doctrine to extend the applicable statute of limitations. *Teamsters & Employers Welfare Trust v. Gorman Bros. Ready Mix*, 283 F.3d 877, 881–85 (7th Cir. 2002).

their contention that the Fund made specific representations that it would disclose the results of the audit prior to initiating any legal action.  Defendant's reliance is misplaced.

While it is true that the Collection Procedures suggest that the Collection Unit will typically "send a Notice of Delinquency to audited employers found to be delinquent,"  Def.'s Mot., Ex. 4, at 4, they also explicitly empower the Unit "to seek legal redress prior to the time that the above procedures are exhausted" if the Director of the Fund determines "in his sole discretion . . . that the interests of affected participants require immediate action."  *Id.* at 3.  Here, the Director of the Fund, David F. Stupar, did conclude that immediate legal action was necessary to protect the interest of the Fund participants.  *See* Pl.'s Opp'n, Ex. E, ¶ 6 ("I concluded, pursuant to my duties as Executive Director of the [Fund], that immediate legal action was necessary to protect the interests of the Fund participants.").  Based on the explicit authority to institute legal proceedings prior to sending a Notice of Delinquency, defendants have not met their burden of establishing that the Fund made a "definite" representation to the contrary.

The IHF Declaration of Trust likewise fails to establish that the Fund made a "definite" representation that it would submit a Notice of Delinquency prior to initiating legal proceedings.  In support of their position, defendants quote the following language from the IHF Declaration of Trust:

> If the audit reveals that inaccurate or insufficient contributions have been made, the Employer agrees to pay all auditors' or accountants' fees and expenses incurred in making the audit, and also all legal fees and costs incurred in collecting said delinquency and auditors' or accountants' fees and expenses if judicial enforcement of this paragraph is necessary.

Def.'s Mot., Ex. 5, at 15.  Contrary to defendants' suggestion, nothing in this language indicates that defendants were entitled to a Notice of Delinquency, the results of the audit, or an

15

opportunity to cure its delinquency before suit could be filed.  Instead, a plain reading of this

language merely indicates that the employer will be responsible for certain costs if and when a

collection lawsuit is pursued.  Moreover, other language in the IHF Declaration of Trust

affirmatively states that "[t]he Trustees are empowered to take whatever steps they deem

necessary, including legal action, to collect such delinquent payments, any provisions of the

collective bargaining agreement or other written agreement to the contrary notwithstanding."  *Id.*

Accordingly, the court rejects defendants' equitable estoppel argument.

> ### b.  Failure to Exhaust

Next, defendants argue that the Trustees' claim against Interior Finishes seeking unpaid

union "dues checkoffs"[9] is barred by the grievance-arbitration provisions of the applicable

collective bargaining agreements.  All three of the relevant agreements contain arbitration

provisions.  For example, the Maryland Agreement provides in relevant part that:

> SECTION 1.  A grievance within the meaning of the Agreement shall be any
> controversy or dispute arising between the parties hereto relating to any matter of
> wages, hours and working conditions, or any dispute between the parties
> involving the interpretation or application of any provision of this agreement.
> 
> *          *          *
> 
> SECTION 6.  It is agreed by both parties to this Agreement . . . that the grievance
> procedure shall be the sole remedy available to either party seeking redress of
> grievances under this Agreement.

---

[9]  A union dues checkoff system is a "procedure whereby an employer deducts union dues
directly from employees' wages and submits such sums to the union."  *Flynn v. Mastro Masonry
Contractors*, 237 F. Supp. 2d 66, 68 n.1 (D.D.C. 2002) (citing BLACK'S LAW DICTIONARY (6th
ed. 1990)).

Pl.'s Reply, Ex. D, at 21–22.[10]  The September 11, 1998, Agreement, the terms of which were

incorporated into the Massachusetts Agreement, and Article XII of the International Agreement

also contain arbitration provisions.

Defendants do not challenge the Trustees' ability to seek, *on its own behalf*, unpaid

contributions to the Fund without exhausting these arbitral remedies.[11]   Rather, defendants takes

issue with the propriety of the Trustees seeking unpaid union dues *on behalf of BAC* without first

arbitrating such claims.  Defendants' position has merit.

The Trustees do not have an independent right to the dues checkoffs at issue.  Rather,

pursuant to the terms of the pertinent collective bargaining agreements, it is the union that has the

right to these dues.  *See* Pl.'s Reply, Ex. D, at 16 (under the Maryland Agreement, dues checkoffs

owed to the local union); *id.*, Ex. F, at 13 (under the September 1, 1998, agreement, which was

incorporated into the Massachusetts Agreement, union dues were paid to the local union); Pl.'s

---

[10]  The Trustees assert that, "because BAC is not a party to the local agreement, that agreement's arbitration provision has no bearing on this action."  Pl.'s Opp'n at 25 n.45.  The court disagrees.  As was discussed at length in a recent memorandum opinion issued by this court involving the same plaintiffs and similar legal issues, "the International BAC was an intended third-party beneficiary of the collective bargaining agreements" entered into with the local unions, and therefore the grievance procedures in those agreements are applicable to the International BAC.  *Flynn v. Tiede-Zoeller*, 2006 U.S. Dist. LEXIS 2258, at *15–24 (D.D.C. Jan. 24, 2006) (Kennedy, J.).

[11]  Generally, in the absence of an unambiguous expression by the parties to the contrary, pension funds are not required to exhaust collective bargaining agreement arbitration procedures prior to filing an action for collection of delinquent contributions to the pension fund.  *See, e.g.*, *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 372 (1984) ("[T]he presumption of arbitrability is not a proper rule of construction in determining whether arbitration agreements between the union and the employer apply to disputes between trustees and employers"); *Flynn v. Dick Corp.*, 384 F. Supp. 2d 189, 202 (D.D.C. 2005) ("[P]ension funds are not required to exhaust collective bargaining agreement arbitration procedures prior to filing an action for collection of delinquent contributions.") (citing ERISA LITIGATION HANDBOOK § 7.01(H) (Aspen 2004)).

Mot., Ex. H, at 12 (under the International Agreement, dues checkoff payments owed to local union); *see also McKenzie Eng'g*, 217 F.3d at 582 ("Because collective bargaining agreements between [the employer and the union were applicable], the Funds may sue under ERISA to recover unpaid contributions mandated by those agreements, and the local unions may sue for unpaid union dues and benefit contributions not covered by ERISA.").  Therefore, as the union is not a party to this suit, the Trustees bring the claim for unpaid union dues on behalf of the BAC.[12] However, because the Trustees are standing in the shoes of the union for purpose of the union dues claims "whatever exhaustion requirements would apply to the International BAC, similarly would be applicable to the Trustees with respect to the claims asserted on the International BAC's behalf." *Flynn v. Tiede-Zoeller*, 2006 U.S. Dist. LEXIS 2258, at *10–11 (D.D.C. Jan. 24, 2006) (Kennedy, J.).  Because, under the terms of the collective bargaining agreement, the BAC would be required to arbitrate any dispute involving unpaid union dues, so too must the Trustees.

The Trustees attempt to avoid their contractual obligation to arbitrate the union dues dispute by suggesting that enforcement of the arbitration provision would frustrate the "purposes behind ERISA."  Pl.'s Opp'n at 26.  Specifically, the Trustees argue that requiring unions to "pursue collection of a small portion of the overall package of fringe benefits—dues checkoff—in mandatory arbitration even though collection of all the other elements of that package of benefits was already being pursued in an existing lawsuit" would increase the expenses associated with collection of delinquencies and thereby undermine the efficient collection of unpaid "employer obligations."  *Id.* at 25–26.  This argument is without merit.  As

---

[12]  The authority of the Trustees to seek unpaid union dues on behalf of BAC is seemingly conveyed by the Collection Procedures.  Pl.'s Mot., Ex. F, at 1.

the Trustees note, Congress intended for ERISA—specifically the Multiemployer Pension Plan Amendments of 1980—to address the "serious problem" caused by employers who fail to make "required contribution[s]" to pension plans.  STAFF OF S. COMM. ON LABOR AND HUMAN RESOURCES, THE MULTIEMPLOYER PENSION PLAN AMENDMENTS ACT OF 1980: SUMMARY AND ANALYSIS OF CONSIDERATION 43 (Comm. Print 1980).  ERISA is not, however, meant to protect the treasuries of labor organizations.  Making it less costly and more efficient for labor unions to recoup unpaid union dues has no impact on the "serious problem" recognized by Congress. Moreover, mere inconvenience is not a sufficient reason to overcome the presumption of arbitrability that exists for union claims brought pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185.  *See Wright v. Universal Mar. Serv. Corp.*, 525 U.S. 70, 78 (1998) ("In collective bargaining agreements, we have said, there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.") (internal quotations omitted).

For these reasons, the court holds that, because the grievance procedures in the collective bargaining agreements were not followed, defendants' motion is granted with respect to any claims against Interior Finishes for union dues brought on behalf of BAC.[13]  Moreover, this conclusion is equally applicable to the Trustees' claims that RHI failed to make dues checkoff payments for work performed by its employees.

---

[13]  Because the court has dismissed the Trustees' claims for dues checkoffs for failure to exhaust, the court need not address defendants' remaining argument that the National Labor Relations Board has exclusive jurisdiction over the claim for unpaid union dues.

3. *Extent of Unpaid Contributions*

Having resolved the defenses asserted by defendants, the court must next determine whether the undisputed evidence establishes that Interior Finishes failed to make required contributions to the Fund, and if so, the scope of such unpaid contributions.  The Trustees hired an auditor to determine whether Interior Finishes met its contractual contribution obligations, and if not, to calculate the amounts owed by the employer.  The auditor determined that "Interior Finishes failed to correctly report and make contributions and dues checkoff payments on a total of 6,469.50 hours and, based on these hours, failed to contribute a total of $23,287.65" from March 1, 2002 through April 30, 2003.  Pl.'s Mot., Ex. B, ¶ 15.[14]

Defendants do not dispute that it failed to make all required contributions but assert that the results of the audit are flawed and overstate the extent of Interior Finishes' contribution deficiency.  Specifically, defendants contend that the hours of covered work for which the auditor asserts contributions were not paid is too high due to "double-counting of hours, [and] erroneous attempts by the auditors to estimate hours based upon manual checks that had been issued to employees for meal and lodging expenses rather than hours worked."  Def.'s Opp'n at 10.  Defendants note "one particularly significant error," whereby the auditor counted holiday hours paid to employees for purposes of contributions when the collective bargaining agreement

---

[14]  The Trustees note that defendants failed to provide the auditor with Interior Finishes' books and payroll records from May 1, 2003 through July 15, 2003.  Because the court has determined that Interior Finishes was bound to make contributions to the Fund through at least July 15, 2003, the court grants the Trustees' motion to the extent it seeks an order requiring Interior Finishes to produce these records.

assertedly limits contribution obligations to those hours actually "worked." *Id.* at 11.  For this reason, defendants argue that the scope of their unpaid contributions is disputed and, therefore, summary judgment is inappropriate.

For their part, the Trustees fault defendants for failing to identify "*which* hours were effected by this purported error, *how many* hours were affected, or *how much money* should be subtracted from the claimed damages as a result of this alleged error, let alone cite or attach any documents supporting these claims."  Pl.'s Reply at 22–23.  Instead, according to the Trustees, defendants' "claims of error rely entirely upon a conclusory declaration," *id*. at 23, and are insufficient to defeat summary judgment.

The court need not reach the question of whether defendants' evidence is sufficient to defeat summary judgment because there is another basis for denying summary judgment as to this claim.  As discussed above, the court concludes today that the Trustees' claims on behalf of BAC for unpaid union dues must be dismissed.  However, the evidence presented by the Trustees regarding the scope of Interior Finishes' asserted liability fails to separate unpaid contributions to the Fund and unpaid union dues.  Rather, the Trustees' evidence simply lumps the two figures together and claims that the total unpaid amount is $23,287.65.  Therefore, because there is no evidence as to the extent of Interior Finishes' unpaid contributions to the Fund, the court is precluded from granting summary judgment in favor of the Trustees on their claims against Interior Finishes.

**B.  Claims Against RHI as Interior Finishes' Alleged Alter Ego**

RHI was never party to a collective bargaining agreement with BAC or any of its local unions and was therefore never directly obligated to make contributions to the Fund.

Nonetheless, the Trustees claim that RHI and Interior Finishes are alter egos of each other, and, therefore, RHI is liable for all obligations imposed by the collective bargaining agreements to which Interior Finishes is bound.  The Trustees assert that "RHI began self-performing covered floor covering work upon the cessation of Interior Finishes' operations" in 2004.  Pl.'s Mot. at 28–29.  By failing to make contributions to the Fund from that point forward, the Trustees claim that RHI violated Section 515 of ERISA.

   *1.  Legal Principles*

   The alter ego doctrine was developed to prevent employers from evading their obligations under collective bargaining agreements and labor laws by making "a mere technical change in the structure or identity of the employing entity . . . without any substantial change in its ownership or management."  *Howard Johnson Co. v. Detroit Local Joint Executive Bd.*, 417 U.S. 249, 259 n.5 (1974); *see also Flynn v. R.C. Tile*, 353 F.3d 953, 958–62 (D.C. Cir. 2004); *Mass. Carpenters Cent. Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304, 307–09 (1st Cir. 1998).  Alter ego liability "protects the federal interest in the solvency of multiemployer pension plans by enabling ERISA trustees to recover delinquent contributions from a sham entity used to circumvent the participating employer's pension obligations."  *R.C. Tile*, 353 F.3d at 958.

   In *R.C. Tile*, the D.C. Circuit instructed that when determining whether two entities are alter egos, courts in this circuit must "evaluate the similarities between the two enterprises in their ownership, management, business purpose, operations, equipment, and customers" as well as "any transactions or other dealings between the two entities."  *Id.*[15]  However, "no single factor

---

[15]   The two entities involved in *R.C. Tile* were unincorporated businesses.  The D.C. Circuit suggested that "[d]ifferent considerations may be relevant where a corporation is involved."  353 F.3d at 958 n.3 (citing *Greater Kansas City Laborers Pension Fund v. Superior*

is controlling, and all need not be present to support a finding of alter ego status." *Id.* (quoting *Belmont Concrete*, 139 F.3d at 308). Based on these factors, the Trustees contend that "the undisputed material facts in the present case leave little doubt that Interior Finishes and RHI are alter egos." Pl.'s Mot. at 16.

Defendants respond by suggesting that application of the alter ego doctrine under the facts of this case would be "a misuse of this equitable doctrine" and would be "at odds with the policies underlying" it. Def.'s Mot. at 10. Seizing on language from *R.C. Tile* and other cases from this jurisdiction, defendants argue that the purpose of the alter ego doctrine is to prevent a sham entity from evading its obligations under ERISA. *Id.* at 11; *see also R.C. Tile*, 353 F.3d at 958 (alter ego liability enables "trustees to recover delinquent contributions from a sham entity") (emphasis added); *Flynn v. Ohio Bldg. Restoration Inc.*, 317 F. Supp. 2d 22, 33 (D.D.C. 2004) (same); *Flynn v. Thibodeaux Masonry, Inc.*, 311 F. Supp. 2d 30, 40 (D.D.C. 2004) (same); *Joyce v. Silveri Title Co.*, 27 F. Supp. 2d 251, 256 (D.D.C. 1998) ("The 'alter ego doctrine' prevents employers from evading their obligations under labor laws and CBA's if the apparent transfer of operations is merely a sham, creating a disguised continuance of a predecessor's operations."). Defendants insist that, because RHI was never a "sham entity" created to circumvent the collective bargaining agreements of Interior Finishes, application of the alter ego doctrine would be inappropriate.

---

*General Contractors, Inc.*, 104 F.3d 1050, 1055 (8th Cir. 1997)). This court agrees with the reasoned decision of Judge Walton in *Flynn v. Ohio Bldg. Restoration, Inc.*, 317 F. Supp. 2d 22, 29–33 (D.D.C. 2004), which held that, despite this suggestion by the D.C. Circuit, the standards applied in *R.C. Tile* should likewise apply to cases involving incorporated businesses.

Defendants rely heavily on two cases from the First and Sixth Circuits to support their argument.  In *Mass. Carpenter Central Collection Agency v. A.A. Building Erectors, Inc.*, 343 F.3d 18 (1st Cir. 2003), the First Circuit affirmed the district court decision that, "notwithstanding the strong identity between Kalwall [a non-union general contractor] and A.A. Building [a unionized subcontractor], there was no reason to invoke the alter ego doctrine" because the establishment of A.A. Building "was neither designed to permit, nor had the effect of permitting, Kalwall to avoid preexisting labor law obligations." *Id.* at 21.  In so concluding, the First Circuit recognized that the alter ego doctrine:

> is not a formalistic mechanism for reflexively regarding distinct jural entities as legally interchangeable whenever the entities' relationship is marked by a sufficient number of the doctrine's characteristic criteria. . . . Rather, the doctrine is a tool to be employed when the corporate shield, if respected, would inequitably prevent a party from receiving what is otherwise due and owing from the person or persons who have created the shield.

*Id.* at 21–22.  Two factors were important to the First Circuit's holding that application of the alter ego doctrine would be inequitable:  (1) there was no evidence that A.A. Building deceived the union about its structure, ownership, or relationship with Kalwall, or the fact that Kalwall regularly subcontracted with non-union workers; and (2) there was no indication that the relationship between A.A. Building and Kalwall changed over the years or caused the pension fund to receive less than that for which they bargained.  *Id.* at 22.  With regard to the first factor, the First Circuit noted that, if the union "wants to ensure that employers with whom it contracts are not or will not be part of a double-breasted operation, we see no reason why it cannot bargain for such an arrangement." *Id.*  As for the second factor, the court of appeals recognized that "in all the cases involving application of the labor law alter ego doctrine" reviewed by the court, "the

union membership with rights under the collective bargaining agreement has been somehow worse off following some change in the structure or operations of the employer with whom the collective bargaining agreement was negotiated." *Id.*

Relying on *A.A. Builders*, the Sixth Circuit recently reached a similar result in a case involving application of the alter ego doctrine to a double-breasted operation.  In *Trustees of the Resilient Floor Decorators Insurance Fund v. A&M Installations. Inc.*, 395 F.3d 244 (6th Cir. 2005), the court of appeals refused to hold Carpet Workroom, Inc., a non-union carpet and floor installation company, liable for insurance fund contributions of its alleged alter ego, A&M Installations, Inc.  The Sixth Circuit concluded, much like the First Circuit did in *A.A. Builders*, that because the trustees did not assert that "A&M concealed its close relationship with Carpet Workroom, and because there [was] no indication that [the trustees had] not received the full benefit of its collective bargaining agreement with A&M, the application of the alter ego doctrine is inappropriate." *Id.* at 248.

Defendants argue that the court should adopt the logic of these two opinions and conclude that "[t]here is no purpose for applying the [alter ego] doctrine here."  Def.'s Mot. at 15.  The Trustees, not surprisingly, disagree.  First, the Trustees assert that the opinions of the First and Sixth Circuit necessarily require that, in order for alter ego liability to exist, there must be an "intent to evade preexisting obligations."  Pl.'s Opp'n at 10.  This, according to the Trustees "is another way of saying that there must be a showing of 'anti-union animus' or 'wrongful motive' as a prerequisite to a finding of alter ego."  *Id.* at 10–11.  Because such requirements "have been squarely rejected in this Circuit," the Trustees argue that the cases relied upon by defendants are "inapplicable to the present action."  *Id.*

25

The court disagrees with the Trustees and concludes that, contrary to the Trustees' argument, both *A.A. Building* and *A&M Installations* are fully consistent with this circuit's precedent.  While it is true that the D.C. Circuit has held that a finding of anti-union animus or wrongful motive is not required when holding that two entities are alter egos of each other for purposes of ERISA liability, *R.C. Tile*, 353 F.3d at 960,[16] so too have the First and Sixth Circuits. *See Belmont Concrete*, 139 F.3d at 309 ("A finding of anti-union animus is not essential to sustain a finding that [two entities] are alter egos."); *NLRB v. Allcoast Transfer, Inc.*, 780 F.2d 576, 581 (6th Cir. 1986) ("[W]e conclude that a finding of employer intent is not essential or prerequisite to imposition of alter ego status.").  Moreover, both these First and Sixth Circuit opinions pre-date, and were cited with approval by, the *A.A. Building* and *A&M Installations* opinions.  Given the fact that both these opinions arose in circuits with similar views on the requirements for alter ego liability as this circuit, the court cannot agree with the Trustees' argument that they are incompatible with D.C. Circuit precedent.

As defendants correctly suggest, *A.A. Building* and *A&M Installations* do not require a showing of anti-union animus, but rather stand for the proposition that the alter ego doctrine—an equitable doctrine—should not be invoked in the absence of inequity.  Def.'s Reply at 5–7.  The court agrees.  "As a general rule, the [alter ego] doctrine is thought to be equitable in nature. Consequently, it 'can be invoked only where equity requires the action to assist a third party.'" *Intergen N.V. v. Grina*, 344 F.3d 134, 149 (1st Cir. 2003) (quoting *McCarthy v. Azure*, 22 F.3d

---

[16]  In *R.C. Tile*, the D.C. Circuit stated that, although "[a]nti-union animus may be a reason one entity should be deemed the alter ego of another for the purpose of assigning liability under the ERISA, . . . the absence of anti-union animus certainly does not establish that two entities are not alter egos." 353 F.3d at 960.

351, 362–63 (1st Cir. 1994)).  Therefore, the court agrees with the First and Sixth Circuits and

holds that a non-union entity should not be required to make pension fund contributions under

the alter ego doctrine when its unionized counterpart discloses the relationship between the two

entities prior to entering into a collective bargaining agreement with the union and the union

receives the full benefit of that agreement.

       2.  *Applicability of the Alter Ego Doctrine to this Matter*

       Having determined the legal parameters governing the Trustees' claims against RHI, the

court must apply these parameters to the facts at hand.  The Trustees argue that the facts of this

case are distinguishable from those in *A.A. Building* and *A&M Installations* and that, even under

the legal standards adopted in those cases, the Trustees are entitled to summary judgment.

Specifically, the Trustees allege that, unlike in *A.A. Building* and *A&M Installations*, (1) the Fund

did not receive the full benefit of the collective bargaining agreement with Interior Finishes

because Interior Finishes ceased operating and its employees began performing work for RHI on

a non-union basis; and (2) Article XIV of the International Agreement explicitly prohibits

double-breasted operation.  Pl.'s Opp'n at 11–19.  The court does not agree that either of these

allegations are sufficient to establish that application of the alter ego doctrine is appropriate.

       First, the Trustees argue that, unlike in the two cases relied upon by defendants, the

evidence in this case establishes that there "was a change in Dale Stevens' corporate operations

that caused the Plaintiffs to receive less in contributions."  *Id.* at 17.  The Trustees allege that

Interior Finishes ceased its operations in 2004.  Thereafter RHI allegedly began self-performing

the very same work with many of Interior Finishes' former unionized employees, but now on a

non-union basis.  As a result, the Fund assertedly received less contributions than it was due. The Trustees' argument is without merit.

Contrary to the Trustees' assertions, the evidence establishes that Interior Finishes did not "shut down" in 2004.  It is undisputed that Interior Finishes continued to advertise for business throughout 2004 and 2005, something uncharacteristic of a business entity that has closed its doors in order to avoid union responsibilities.  Pl.'s Reply, Exhs. 1-B & 1-C. Moreover, it is also undisputed that, since allegedly shutting down, fourteen bids have been submitted on behalf of Interior Finishes, which, if accepted, would have generated almost $3 million in sales revenue and would have been performed by Interior Finishes' unionized workforce.  Pl.'s Opp'n, Ex. 4 ¶¶ 17, 18, 19.  Again, these actions do not comport with a "closed" corporation.

Even had Interior Finishes actually "shut down," as suggested by the Trustees, the court would still conclude application of the alter ego doctrine is inappropriate given that "the union membership with rights under a collective bargaining agreement" was not "worse off" than it was before the asserted closing.  *A.A. Buildings*, 343 F.3d at 22.  During the time Interior Finishes performed any significant flooring work, all of its projects were performed for a single customer—the May Company.  Since 2004, the May Company has selected other union contractors to perform its projects.  It is simply incorrect to suggest that RHI has begun performing these projects on a non-union basis with former Interior Finishes' employees.[17] Therefore, the Fund continues to receive contributions for the same work previously performed

---

[17]  RHI self-employed approximately twelve Interior Finishes' former employees for a brief period in 2004.  The undisputed evidence, however, establishes that these employees did not work on any of Interior Finishes' former projects, nor did they even work in the same geographical area that Interior Finishes worked.

by Interior Finishes, only now those contributions are coming from different subcontractors.  As

such, the Fund is still presumably receiving pension contributions from those subcontractors.

Therefore, because the union membership and the Fund are not "worse off" than before,[18]  the

purposes of the alter ego doctrine would not be served by its application in this case.

Next, the Trustees' assert that Article XIV of the International Agreement supports

application of the alter ego doctrine.  Article XIV requires the payment of fringe benefit

contributions for any covered work performed by Interior Finishes in its own name or "under the

name of another entity . . . wherein [Interior Finishes], including its officers, or partners exercises

[sic] . . . any significant degree of ownership, management or control."  Pl.'s Mot., Ex. H, at 14.

According to the Trustees, this provision imposes the contribution obligations of Interior

Finishes on RHI, "*irrespective of whether they were alter egos*," simply by virtue of the fact that

Stevens was the sole officer, director, and owner of both RHI and Interior Finishes.  Pl.'s Opp'n

at 13 (emphasis in original).

As an initial matter, it is unclear whether Interior Finishes is bound by Article XIV of the

International Agreement.  Defendants insist that the version of the International Agreement

signed by Stevens did not contain Article XIV and the Trustees insist that it did.  Both parties

submit multiple affidavits to support their version of events and both parties accuse the other side

of inventing facts.  Ultimately, however, resolution of this factual dispute has no bearing on

whether the alter ego doctrine should be applied in this case.

---

[18]  Were the court to mandate that RHI make contributions to the Fund as Interior
Finishes' alter ego, the Fund would actually be better off than before, as it would be receiving
contributions from both the union company who actually received the bids from the May
Company as well as from RHI.

Contrary to the Trustees' suggestion, Article XIV does not establish that RHI and Interior Finishes are alter egos and has no bearing on whether the court should apply the alter ego doctrine to the facts of this case. Rather, as the Trustees emphasize, it simply creates an independent contractual basis for contributions, "*irrespective of whether they were alter egos*." *Id.* (emphasis in original). Given this concession by the Trustees, the court does not believe that the validity of Article XIV is relevant to the issue before the court—whether equity requires holding that RHI and Interior Finishes are alter egos.[19] Regardless of the validity of Article XIV, there is no dispute that the Trustees were aware of the relationship between RHI and Interior Finishes.[20] Paraphrasing the First Circuit, "there is no evidence that [Interior Finishes] deceived the [Fund] about its structure, ownership, relationship with [RHI], or the fact that [RHI] regularly

---

[19] This conclusion should not be read to imply that the validity of Article XIV has no relevance to the legal obligations of the parties in this case. It does. Its relevance, however, is limited to the question of whether RHI breached the International Agreement by not making contributions to the Fund.

The court, however, does not read the Trustees' Amended Complaint to assert a claim for breach of contract. Instead, the Trustees opted to rely solely on the equitable alter ego doctrine to establish liability. *See* Am. Compl. at 7 (seeking an order "declaring that Defendants, Interior Finishes, Inc., and R.H.I., Inc., are alter egos of each other"). Moreover, by only seeking contributions for the time period after Interior Finishes allegedly ceased operating in 2004, the Trustees implicitly acknowledge that they are not relying on an alleged breach of Article XIV for the relief they seek. Pl.'s Opp'n at 12 ("In the present case, . . . the Plaintiffs are only seeking to impose a contribution obligation on RHI from the time that Interior Finishes ceased operating, forward."). If Article XIV were the basis of their claim, the Trustees would have a right to seek contributions from RHI from 2002—the date the International Agreement became effective—onward.

[20] Because the court rejects application of the alter ego doctrine, it need not address defendants' arguments that the Trustees' claims are barred (1) for failure to exhaust administrative remedies and (2) because RHI's independent contractors were not employees within the meaning of ERISA. Def.'s Mot. at 19–22.

subcontracts with non-unionized [installers]." *A.A. Building*, 343 F.3d at 22.  Therefore, there is

no equitable basis for holding RHI liable to make contributions to the Fund.

### III. CONCLUSION

For the aforementioned reasons, it is this 23rd day of March, 2006, hereby

**ORDERED** that defendants' motion for summary judgment [#22] is granted in part and

denied in part as set forth in this Memorandum Opinion; and it is further

**ORDERED** that plaintiffs' motion for summary judgment [#23] is granted in part and

denied in part as set forth in this Memorandum Opinion; and it is further

**ORDERED** that defendants shall turn over to plaintiffs' auditor, within 60 days of this

order, any book and records of Interior Finishes, Inc. from May 1, 2003 through July 15, 2003

that were not previously provided to the auditor.

Henry H. Kennedy, Jr.
United States District Judge